[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-14127
Non-Argument Calendar
_____

D.C. Docket No. 1:19-cv-00008-JRH-BKE

VANESSA ANDERSON,
individually and on behalf of a class of similarly situated persons,

Plaintiff-Appellee,

versus

WILCO LIFE INSURANCE COMPANY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(November 22, 2019)

Before MARCUS, GRANT and HULL, Circuit Judges.

HULL, Circuit Judge:

In this interlocutory appeal, defendant Wilco Life Insurance Company ("Wilco") appeals from the district court's order granting plaintiff Vanessa Anderson's motion to remand this putative class action back to a Georgia state court.  In this case, Anderson, on behalf of herself and all those similarly situated, sued her former insurer, Wilco.  Anderson alleges that Wilco improperly raised the cost of insurance premiums for her life insurance policy, which caused her policy to lapse.  As relief, Anderson seeks both money damages and declaratory and injunctive relief requiring Wilco (1) to reinstate all life insurance policies that were surrendered or lapsed as a result of the improper premium increases and (2) to lower premiums.

Anderson filed her lawsuit in the Superior Court of Columbia County, Georgia.  Wilco timely removed the case to the United States District Court for the Southern District of Georgia under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).  The federal district court remanded the case to state court, concluding that Wilco had not met its burden of showing that the amount in controversy exceeded $5 million, as required by CAFA.  This Court granted Wilco permission to appeal under 28 U.S.C. § 1453(c).

Because plaintiff Anderson seeks equitable relief to reinstate a lapsed or surrendered life insurance policy, we conclude that (1) the face value of the policy can be used to satisfy the amount-in-controversy requirement, and (2) the

2

aggregate face value of the life insurance policies here is over $75 million. Wilco thus has met its burden of proving by a preponderance of the evidence that the amount in controversy exceeds the $5 million CAFA threshold. Accordingly, we reverse.

## I. BACKGROUND

### A. Putative Class Action

In December 2018, Anderson, on behalf of herself and other similarly situated individuals in Georgia, lodged this class action complaint against Wilco in Georgia state court. According to the complaint, in 2001, Anderson owned a life insurance policy ("the policy") issued by Wilco's predecessor. The policy had a $150,000 death benefit, a planned monthly premium of $35, and was set to mature in 2059, when Anderson reached 100 years old.

Anderson's policy was a "universal" or "flexible premium adjustable" life insurance policy. Universal life insurance policies are hybrid products that combine elements of life insurance with a long-term investment savings component using market-based yields. The insured's premiums are deposited into a savings account, from which Wilco deducts certain monthly expenses to pay for the life insurance portion of the plan. The monthly deduction is comprised of two elements: a cost of insurance ("COI") charge and a nominal monthly expense charge. The COI charge is calculated based on the policyholder's mortality risk

3

and may be adjusted annually based on the policyholder's sex, attained age, and premium class.

The money held in the savings account is called the policy's "accumulation value," and earns interest at a guaranteed rate. For policies like Anderson's, defendant Wilco promised to credit interest on the policyholder's accumulation value at a guaranteed rate of 3% annually. The policyholder, like Anderson, has the option of paying her monthly premiums from external funds or from the policy's accumulation value. If a policy's accumulation value is insufficient to cover a monthly premium deduction, the policy enters a grace period during which the policyholder must pay a premium sufficient to cover the deduction. If the policyholder does not, the policy will lapse.

When Anderson purchased her policy in 2001, her annual premium was approximately $420. Initially, her annual COI charge was less than that premium, which left some amount each year as accumulated value to grow at the guaranteed interest rate. Anderson's annual COI charge, however, increased year after year as follows:

| Policy Year | Annual COI Charge | Percent Change from Prior Year |
|:---:|:---:|:---:|
| 2003-2004 | $233.71 | |
| 2004-2005 | $260.00 | 11.25% |
| 2005-2006 | $286.32 | 10.12% |

4

| 2006-2007 | $312.62 | 9.19% |
|---|---|---|
| 2007-2008 | $334.82 | 7.10% |
| 2008-2009 | $352.07 | 5.15% |
| 2009-2010 | $373.54 | 6.10% |
| 2010-2011 | $397.70 | 6.33% |
| 2011-2012 | $578.54 | 45.47% |
| 2012-2013 | $571.98 | (1.13%) |
| 2013-2014 | $563.10 | (1.55%) |
| 2014-2015 | $695.31 | 23.48% |
| 2015-2016 | $729.35 | 4.90% |
| TOTAL | | 312.07% |

As shown above, the COI charge increased almost every year. However, Anderson alleges that the sudden and dramatic COI rate increases starting in 2012 were not "based on the insured's sex, attained age, and premium class on the date of issue," but rather on Wilco's unlawful effort to avoid its contractual obligations. Wilco allegedly initiated these increases to (1) recoup losses stemming from the guaranteed interest rates provided with the policies, and (2) force policyholders "to surrender their policies when the increases become impossible to pay, so that Wilco can avoid ever having to pay out a death benefit on those policies." Due to

5

the statute of limitations, only COI rates charged after December 6, 2012, are at issue in this action.

More particularly, Anderson alleged that the COI charge taken from her accumulation value: (1) increased by 45.47% from 2011 to 2012; (2) decreased by 1.13% and 1.55% in 2013 and 2014; (3) increased again by 23.48% from 2014 to 2015; and then (4) increased by another 4.9% the following year. As a result, Anderson's COI charge went from approximately $33.14 monthly ($397.70 annually) to $60.78 monthly ($729.35 annually).

According to Anderson's complaint, these increases made her policy unaffordable. While Anderson's accumulation value had grown to $764.90 by 2012, once Wilco started deducting these increased COI charges, her accumulation value was completely depleted by July 2017. This caused her policy to lapse. Anderson asserted that the same thing happened to other putative class members.

Based on these allegations, Anderson claimed that Wilco breached her policy and the implied duty of good faith and fair dealing. She sued on behalf of all Georgia residents who owned or own policies with the same COI language as her policy and whose COI rates were increased after December 6, 2012. As relief, Anderson sought not only money damages, but also declaratory and injunctive relief requiring Wilco to reverse the allegedly illegal COI rate increase and to

6

reinstate all life insurance policies that were surrendered or lapsed as a result of the increased COI charges.

## B.    Removal and Remand

As noted, defendant Wilco removed this case to the federal district court pursuant to CAFA, 28 U.S.C. § 1332(d).[1]  CAFA grants federal district courts jurisdiction over class actions where (1) any member of the plaintiff class is a citizen of a state different from the state of citizenship of any defendant, (2) the aggregate amount in controversy exceeds $5 million, and (3) the proposed plaintiff class contains at least 100 members.  See 28 U.S.C. § 1332(d)(2)(A), (5)(B), (6); Dudley v. Eli Lilly & Co., 778 F.3d 909, 911–12 (11th Cir. 2014).

Wilco's notice of removal alleged that all three CAFA requirements were satisfied.  Anderson does not dispute that two of those requirements are met here— that is, Anderson is a citizen of Georgia and Wilco is a citizen of Indiana and the proposed class contains over 100 Georgia residents.  The only CAFA requirement that Anderson contests is the amount in controversy.

---

[1]Wilco also sought removal of this lawsuit based on traditional diversity jurisdiction, under 28 U.S.C. § 1332(a), asserting that: (1) Wilco is incorporated and has its principal place of business in Indiana, while Anderson is a citizen of Georgia; and (2) Anderson's requested damages, attorney's fees, and injunctive relief totaled more than $75,000.  Because this interlocutory appeal concerns solely Wilco's theory of jurisdiction under CAFA, we do not discuss traditional diversity jurisdiction here.

As to the amount in controversy, Wilco stated that, because Anderson sought to reinstate the lapsed or surrendered life insurance policies—that is those owned by Georgia residents containing the same COI language as Anderson's and whose COI rates had increased after December 6, 2012—the face value of those policies was at issue. And the aggregate face value of those life insurance policies, i.e., the death benefits, far exceeded the $5 million CAFA threshold.

Anderson moved to remand the case to state court, asserting that Wilco had not established the requisite amount in controversy under CAFA. Anderson urged that it was too speculative to include the life insurance policies' face value in the amount in controversy because whether Wilco will be required to pay the reinstated policies' full death benefits depended on if each policyholder (1) chooses to keep the policy, (2) lives until the maturation date, and (3) maintains the full amount of death benefit, if any.

In its response, Wilco submitted a declaration of one of its operational managers. The declaration stated that Anderson's policy was a Conseco Indexed Universal Life 2 ("CIUL2") policy and there were 581 CIUL2 policies owned by Georgia residents that had lapsed or were surrendered since the effective date of the COI rate increase complained of by Anderson.[2] According to Wilco, the

---

[2]In addition, the declaration said that 45 Conseco Universal Life ("CUL") policies with an aggregate value of $4,767,287 have also lapsed since Wilco began increasing COI rates. Anderson disputes that these CUL policies should count in the amount in controversy because

aggregate face value of those 581 CIUL2 policies was over $75 million. The declaration also estimated that Wilco had deducted approximately $7 million in COI charges from Georgia CIUL2 policies for the entire class period.

After considering the complaint, the removal petition, and the evidence, the district court granted Anderson's motion to remand. The district court concluded that Wilco had not met its burden of proving by a preponderance of the evidence that the amount in controversy exceeded the $5 million jurisdictional threshold in CAFA. The district court decided that (1) the putative class's request for reinstatement of their life insurance policies did not put the face value of the policies at issue because it was too speculative to assume that Wilco would be required to pay the face value on those policies, and (2) Wilco did not carry its burden in showing that the total amount of illegally increased COI charges during the relevant time period for the putative class exceeded $5 million. The district court therefore remanded the class action to the Georgia state court. This is Wilco's appeal.

## II. STANDARD OF REVIEW

We review <u>de novo</u> a district court's decision to remand a CAFA case for lack of subject matter jurisdiction. <u>Dudley</u>, 778 F.3d at 911; <u>S. Fla. Wellness, Inc.</u>

---

it is unclear that those policies contain the same COI provision as in Anderson's policy. We need not resolve this dispute because the aggregate value of the CUIL2 policies alone far exceeds the $5 million CAFA threshold.

v. Allstate Ins. Co., 745 F.3d 1312, 1315 (11th Cir. 2014).  We review for clear error the district court's determination that Anderson failed to establish that the amount in controversy exceeded $5 million by a preponderance of the evidence. Dudley, 778 F.3d at 911.

### III.  DISCUSSION

On appeal, Wilco argues that the district court incorrectly found that this case did not meet the $5 million amount-in-controversy standard under CAFA. According to Wilco, because the putative class seeks reinstatement of their lapsed life insurance policies, the face value of the policies are at issue.

In response, Anderson counters that the putative class is not challenging the validity or face value of the insurance policies, rather her claim is that she and others were overcharged for the policies.  Anderson submits that because her allegations challenge the premium costs, only the wrongfully charged premiums are in the controversy, not the policies' face values.  Anderson also contends that, because it is difficult to predict when the class members will die, or whether their policies will remain in effect until their deaths, and, if so, in what amounts, the value of her request to reinstate the lapsed policies is too speculative to be treated as the amount in controversy in any event.

10

## A.  Removal Under CAFA

As explained, CAFA permits the removal of class actions to federal court where the putative class action includes 100 or more members, at least one plaintiff is diverse from one defendant, and the aggregate amount in controversy exceeds $5 million.  28 U.S.C. §§ 1332(d), 1453.  "Congress enacted [CAFA] to facilitate adjudication of certain class actions in federal court."  Dart Cherokee Basin Operating Co., LLC v. Owens, 574 U.S. 81, 89, 135 S. Ct. 547, 554 (2014).  Unlike in ordinary cases, there is no presumption against removal in CAFA cases.  Id. at 89, 135 S. Ct. at 554 ("It suffices to point out that no antiremoval presumption attends cases invoking CAFA.").

A defendant seeking to remove a case to federal court must file a notice of removal that includes "a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."  Id.  When the plaintiff contests or the court questions the defendant's allegation, the defendant must prove by a preponderance of the evidence that the amount in controversy is sufficient.  Id.; S. Fla. Wellness, 745 F.3d at 1315.  To determine whether the defendant has carried its burden, a court may rely on evidence put forward by the removing defendant, as well as reasonable inferences and deductions drawn from that evidence.  S. Fla. Wellness, 745 F.3d at 1315.

11

"A court's analysis of the amount-in-controversy requirement focuses on how much is in controversy at the time of removal, not later." Pretka v. Kolter City Plaza II, Inc., 608 F.3d 744, 751 (11th Cir. 2010).  Therefore, "the pertinent question is what is in controversy in the case, not how much the plaintiffs are ultimately likely to recover" as a result of the lawsuit. Id. (internal quotation marks omitted); Dudley, 778 F.3d at 913 ("The amount in controversy is not proof of the amount the plaintiff will recover.  Rather, it is an estimate of the amount that will be put at issue in the course of the litigation." (internal quotation marks omitted)); S. Fla. Wellness, 745 F.3d at 1315.

This Court has held that "[f]or amount in controversy purposes, the value of injunctive or declaratory relief is the 'value of the object of the litigation' measured from the plaintiff's perspective." Morrison v. Allstate Indem. Co., 228 F.3d 1255, 1268 (11th Cir. 2000) (quoting Ericsson GE Mobile Commc'ns, Inc. v. Motorola Commc'ns & Elecs., Inc., 120 F.3d 216, 218–20 (11th Cir. 1997)).  Stated another way, "the value of the requested injunctive relief is the monetary value of the benefit that would flow to the plaintiff if the injunction were granted." Id. (quotation marks omitted).  Further, for purposes of CAFA, "we aggregate the claims of individual class members and consider the monetary value that would flow to the entire class if [injunctive or] declaratory relief were granted." S. Fla.

12

Wellness, 745 F.3d at 1316 (concluding that a declaratory judgment would entitle class members to over $68 million in benefits); see also 28 U.S.C. § 1332(d)(6).

While absolute certainty is not required, "the value of declaratory or injunctive relief must be sufficiently measurable and certain to satisfy the amount-in-controversy requirement." S. Fla. Wellness, 745 F.3d at 1316 (quotation marks omitted).  In turn, the amount-in-controversy requirement is not satisfied if the value of the injunctive relief to the class plaintiffs is "too speculative and immeasurable." Cohen v. Office Depot, Inc., 204 F.3d 1069, 1077 (11th Cir. 2000) (quotation marks omitted); see Leonard v. Enter. Rent a Car, 279 F.3d 967, 973 (11th Cir. 2002) (holding that the value of the injunctive relief in question was too speculative to include in the amount in controversy).

## B.  Amount in Controversy Exceeds $5 Million

Here, we conclude that Wilco has carried its burden of establishing that the amount in controversy exceeds $5 million.  This Court has long held that when the validity of a life insurance policy is at issue in a case, the face value of the insurance policy is the amount in controversy.  See Guardian Life Ins. Co. of Am. v. Muniz, 101 F.3d 93, 94 (11th Cir. 1996).

In Muniz, the plaintiff Guardian Life Insurance Company ("Guardian") sought cancellation of a life insurance policy issued to the defendant Estevan Muniz, alleging that Muniz made fraudulent misrepresentations in the insurance

13

application. Id. This Court held that the amount in controversy was the policy's face value because, if the policy was valid, Guardian would be exposed to the risk of a present liability in the amount of the death benefit. See id. (citing N.Y. Life Ins. Co. v. Swift, 38 F.2d 175, 176 (5th Cir. 1930)). As the death of the insured was bound to happen at any time, the insurer's obligation to pay the full face value of the life insurance policy on the death of the insured is "an ever-present liability." Id. (internal quotation marks omitted). The uncertainty of the date of the insured's death affects the date of payment, not the liability. Id. This Court explained further:

> The policies in suit are contracts by which the insured agrees to pay the premiums and the insurer agrees to pay the full face value of the policies on the death of the insured, an event bound to happen. With the uncertainty of life, it may occur at any time, and is an ever-present liability, which the insurer can do nothing to avert, except by seeking relief from a court of equity to cancel the policies on legal grounds. The policies are not voidable at the option of the insurer, nor is it optional with the insurer to compel the insured to accept either the loan or cash surrender value of the policies or to take policies of paid-up insurance. The only fixed and definite liability of the insurer is to pay the face of the policy. That amount measures the loss that plaintiff will suffer if the policies are not canceled.

Id. (quoting Swift, 38 F.2d at 176–77); see also Bell v. Preferred Life Assurance Soc'y, 320 U.S. 238, 239–40, 64 S. Ct. 5, 5–6 (1943) (using the $1,000 face value of insurance certificate, not the $202 in premiums, in calculating the amount-in-controversy requirement in an action concerning a certificate purchased using fraudulent misrepresentations).

14

Similarly, in Waller, this Court held that the face value of a life insurance policy was to be included in the amount of controversy in a suit between a policy holder and insurance company because the plaintiff requested injunctive relief that would keep the policy in force. Waller v. Prof'l Ins. Corp., 296 F.2d 545, 546–48 (5th Cir. 1961) ("Not to be overlooked is the plaintiff's prayer for an injunction against [the insurance company], the effect of which—should it be granted—would be to allow a $50,000 policy to continue until maturity.").

Accordingly, where a plaintiff insured seeks equitable relief to restore a lapsed life insurance policy, the continuing validity of the policy is at stake and the face value of the policy is the amount in controversy. Id. at 547–48; see also In re Minn. Mut. Life Ins. Co. Sales Practices Litig., 346 F.3d 830, 834–35 (8th Cir. 2003) (holding that the face value of a life insurance policy was at issue where the insured sought equitable relief pertaining to the enforcement of a lapsed policy); Elhouty v. Lincoln Benefit Life Co., 886 F.3d 752, 756 (9th Cir. 2018) ("[I]t is long-established that in declaratory judgment actions about whether an insurance policy is in effect or has been terminated, the policy's face amount is the measure of the amount in controversy."); Stephenson v. Equitable Life Assurance Soc'y of the United States, 92 F.2d 406, 409–10 (4th Cir. 1937) (holding that the life insurance face value, plus the value of the double indemnity feature and disability provisions, was the amount in controversy in a suit seeking declaratory relief

15

restoring the life insurance policy to force). This is because a benefit in the amount of the policy's face value would flow to the plaintiff insured if the policy is reinstated.

Because Anderson, on behalf of the class, seeks declaratory and injunctive relief requiring Wilco to reinstate the class members' life insurance policies that lapsed or were surrendered as a result of the increased COI charges, the face value of the policies is to be included in the measure of the amount in controversy. And, as the district court found, Wilco calculated that the aggregate face value of the 581 life insurance policies that lapsed during the class period is over $75 million. Anderson has not shown that this finding is clearly erroneous. Thus, the amount in controversy in this suit far exceeds the $5 million CAFA threshold.

This remains true even though Anderson argues that Wilco overcharged class members for their life insurance policies and also seeks money damages for what she contends were overcharged COI premiums. The amount in controversy for this particular lawsuit is the total amount put at issue in the dispute, which includes the value of the injunctive relief requested and the money damages sought by the class. And in cases where an insured seeks to reinstate terminated life insurance policies, the amount in controversy includes the policies' face value.

Contrary to Anderson's arguments, the value of the injunctive relief in this case is not too speculative to be included in the amount in controversy. In support

16

of her speculation argument, Anderson points to several possible future events that would relieve Wilco of its obligation to pay the face value of the policies, such as (1) if the policyholders later allow the reinstated policies to lapse again, (2) if the policyholders later surrender the reinstated policies, (3) if the policies mature before the policyholders die, and (4) how much coverage the policyholders will have maintained at the time of their death. The problem with this argument is that the amount in controversy for jurisdictional purposes is not subject to increase or decrease based on conjecture as to future events. See S. Fla. Wellness, 745 F.3d at 1316.

Rather, the amount-in-controversy analysis focuses on how much is in controversy at the time of removal, not later. See Pretka, 608 F.3d at 751. And the pertinent issue is not how much the plaintiffs are likely to ultimately recover, "it is an estimate of the amount that will be put at issue in the course of the litigation." Dudley, 778 F.3d at 913 (quotation marks omitted). Indeed, Anderson's speculation argument itself requires "indulging the kind of 'conjecture, speculation, or star gazing' that we have found inappropriate in analyzing the amount in controversy." S. Fla. Wellness, 745 F.3d at 1316–17 (quoting Pretka, 608 F.3d at 754).

We are not persuaded that this case is unlike Muniz because of the nature of universal life insurance policies, as compared to other forms of life insurance. To

17

be sure, there was a similar possibility that the insured in <u>Muniz</u> would later surrender the life insurance policy for cash value or allow it to lapse all together, yet this Court held that the face value of the policy was the amount in controversy in the lawsuit.  <u>See</u> <u>Muniz</u>, 101 F.3d at 94.

Furthermore, even if after reinstatement of the policies the putative class members take steps that alter how much money they ultimately will collect from Wilco that does not necessarily mean that determining now that the amount in controversy exceeds $5 million is too speculative of a task.  "Estimating the amount in controversy is not nuclear science; it does not demand decimal-point precision."  <u>S. Fla. Wellness</u>, 745 F.3d at 1317.  "The larger the calculated amount at stake, the easier it is to be confident that collection contingencies should not count for much."  <u>Id.</u> ("The maximum difference in the amount of payments that rides on the outcome of the declaratory judgment is in excess of $68 million, which is more than thirteen times the $5 million amount-in-controversy threshold.  Even if we speculated that 90% of that amount would be siphoned off by one contingency or another—an extraordinarily unlikely outcome—more than $6.8 million would still be at stake.").  Here, the face value of the life insurance policies at issue is over $75 million, which is more than 15 times the $5 million amount-in-controversy threshold under CAFA.  Applying the reasoning from <u>South Florida Wellness</u>, even assuming the unlikely outcome that 90% of that amount would not

18

be collected by class members due to one contingency or another, more than $7.5 million would still be at stake.  See id.

Anderson's reliance on Mann v. Unum Life Ins. Co. of Am., 505 F. App'x 854 (11th Cir. 2013) (unpublished) is misplaced because there the disputed long-term care policy was never terminated, and the plaintiff did not seek to restore a lapsed policy.  See id. at 856–57.  Thus, there was never a question in Mann as to whether the face value of the policy constituted the amount in controversy.  Rather, in Mann, the plaintiff brought a putative class action in state court against the defendant insurance company, alleging the plaintiffs had been charged insurance premium rates that were higher than permitted under Florida law.  Id. at 855.  The plaintiffs sought, inter alia, an injunction requiring the insurance company to charge them the lower Florida premium rate going forward.  Id.  This Court stated that the defendant insurance company's calculation as the future revenue it would forego if it was required to lower its rates for the putative class was too speculative to be included in the amount in controversy.  Id. at 856–57.  Noting that the policies were renewable each year, this Court reasoned that future optional insurance purchases cannot be included in the amount-in-controversy calculation because "such valuation is speculative, filled to the brim with the assumptions about policyholder behavior and Florida insurance rates."  Id. at 857.

19

While <u>Mann</u> concerned future purchases of long-term care insurance that were merely possible, this case concerns the past purchase of life insurance. Because Anderson and the class seek to reinstate those previously purchased and lapsed life insurance policies, the face value of the policies is the amount in controversy. The aggregate value of those policies—over $75 million—exceeds CAFA's amount-in-controversy threshold.

For similar reasons, <u>Friedman v. N.Y. Life Ins. Co.</u>, 410 F.3d 1350, 1358 (11th Cir. 2005), does not help Anderson either. In <u>Friedman</u>, the plaintiff did not seek reinstatement of any life insurance policy, and no policy had lapsed. <u>Id.</u> Rather, the case involved ongoing health insurance policies and rising health insurance premiums and, as such, it is inapplicable here. <u>Id.</u> at 1351–52. Further, the <u>Friedman</u> plaintiff's requested injunctive relief was "an injunction against continuing violations of Florida law"—which this Court called a "tag-along prayer for injunction." <u>Id.</u> at 1358; <u>see also</u> <u>AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.</u>, 938 F.3d 1170, 1175–79 (11th Cir. 2019) (concluding that the injunction requested by a class action plaintiff was merely a <u>de minimis</u> request and the class action was all about obtaining money damages for past injuries). In stark contrast, Anderson's injunctive demand is that Wilco immediately reinstate the lapsed life insurance policies and that reinstatement

20

demand is an integral and key component of her complaint valued at over $75 million.

## IV.  CONCLUSION

For the foregoing reasons, we must reverse and vacate the district court's order remanding the case to state court and remand for further proceedings consistent with this opinion.

**REVERSED, VACATED, AND REMANDED.**